Filed 6/26/24  Marriage of Yang CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| In re the Marriage of JACK and JACQUELINE YANG. | |
| | D081122 |
| JACK C. YANG, | |
| Respondent, | (Super. Ct. No. D564588) |
| v. | |
| MINH-THU N. HUYNH, | |
| Appellant. | |

APPEAL from an order of the Superior Court of San Diego County, Sharon L. Kalemkiarian, Judge.  Affirmed.

The Appellate Law Firm, Aaron Myers and Mark Kuntze for Appellant.

Higgs Fletcher & Mack, John Morris and Steven M. Brunolli for Respondent.


Jack C. Yang filed a petition in 2016 seeking to divorce Minh-Thu N. Huynh.  In bifurcated proceedings, the court first dissolved the marriage and

later divided the couple's community property. The division of assets required Huynh to make an equalization payment to Yang. When Huynh did not make the required payment, Yang moved to compel the sale of two parcels of real property to satisfy the judgment.

After a series of delays, the court ordered Huynh to sell the two properties to satisfy the judgment. Huynh appeals this order, asserting several reasons why the court abused its discretion in ordering the sale. As we explain below, we reject each of her contentions and affirm the order.

## FACTUAL AND PROCEDURAL BACKGROUND

At the time of their divorce, the couple owned two homes, the family residence and a rental property. Huynh requested that both properties be awarded to her, and the court agreed. Pursuant to an oral ruling in July 2021 that was incorporated in a judgment entered in December of that year, Huynh was directed to make an equalization payment to Yang totaling $1,844,079. The court also ordered a second equalization payment of $435,000 for community property funds Huynh moved out of a shared account. In addition to the equalization payments, Huynh was required to pay Yang $100,000 in attorney fees and a sanction of $20,000. In total, the court ordered Huynh to pay Yang a cash total of $2,502,734.

To facilitate that payment, the court permitted Huynh to "refinance the propert[ies], if she chooses to" or to sell the properties. Of course, Huynh was not *required* to either refinance the homes or sell them if she had another source of the money to satisfy the court's judgment. "But, at this point," the judge told her, "the only path forward for you to come up with the 2.5 million, unless you have some other source and can get a cashier's check over to [Yang's attorney], is the homes are sold." If, within 60 days of the entry of judgment, Huynh was "in the process of refinancing without any anticipated

problems, the Court would permit her to finish the process." But the court also made clear it would not accept a claim that her rate was unfavorable or that she was having a hard time. Absent an equalization payment, the property would be sold. The court advised all parties that it had "the authority to order that [the equalizing payment] be made out of the community estate." Refinancing the properties was expected to generate sufficient cash to provide Yang with the court ordered payment.

Huynh received the benefit of additional time to complete the refinancing because the court did not enter judgment until December 2021, and calculated 60 days from entry of judgment to be February 3, 2022—approximately seven months after the court made its oral pronouncement. Yang inquired as to its progress in January 2022. From the record before us, it appears his inquiry went unanswered. Ultimately, Huynh was unsuccessful in refinancing the properties or in otherwise funding the payment to Yang.

Yang filed ex parte request for an order to sell the properties. As best we can discern, Huynh asserted that her plan was to pay Yang $1,479,766 from partially refinancing the homes, a portion of her share of the community retirement account, and she hoped to pull the remainder from frozen accounts. This was insufficient to make the equalization payment and the court indicated its tentative was to order the properties sold. Unpersuaded by Huynh's subsequent argument, the court granted Yang's request for an order to sell the properties on June 27, 2022. Huynh now appeals.

## DISCUSSION

Under Family Code section 2550, the trial court must divide the community estate of the parties equally. To achieve this equal division, "trial courts possess broad discretion to determine the manner in which marital

3

property is divided." (*In re Marriage of Cream* (1993) 13 Cal.App.4th 81, 88.) "One or more of the following methods of division may be used: (1) in kind, (2) asset distribution or cash out, (3) sale and division of proceeds, or (4) conversion to tenancy in common where the sale of the family home is deferred pursuant to [Family Code] section 4700.10." (*Ibid.*) We evaluate this order directing the sale of community property for an abuse of discretion. (*In re Marriage of Oliverez* (2019) 33 Cal.App.5th 298, 309.) "[I]t is generally accepted that the appropriate test of abuse of discretion is whether or not the trial court exceeded the bounds of reason . . . [and] when two or more inferences can reasonably be deduced from the facts, a reviewing court lacks power to substitute its deductions for those of the trial court." (*In re Marriage of Connolly* (1979) 23 Cal.3d 590, 598 (*Connolly*).)

In arguing that the trial court abused its discretion in ordering that the properties be sold, Huynh makes three arguments: (1) the court ignored evidence that Yang failed to cooperate in refinancing the property; (2) the court erred in treating the parcels as mere fungible pieces of property; and (3) the court failed to follow the timeline for refinancing as laid out in the judgment. We address each of these arguments in turn and in the context of the circumstances before the trial court. (*Connolly, supra*, 23 Cal.3d at p. 598.)

## A. *Yang's Participation in the Refinancing Process*

Huynh first asserts that the court ignored Yang's lack of participation in the refinancing effort. She maintains Yang is the reason the refinancing did not move forward prior to the deadline, claiming that both she and the lender sent emails to Yang and his attorneys prior to February 3, 2022. While the record contains several attempts to contact Yang or his counsel regarding the refinancing, none of them bear a date before February 3, 2022.

4

Nevertheless, Huynh moved to compel Yang's participation in refinancing after the deadline. In accordance with the purpose of the refinancing, the court denied Huynh's request for order to compel Yang to comply. Of initial concern to the court, Yang could not comply with the refinancing efforts prior to the deadline because neither he nor his counsel were contacted prior to the deadline. There was nothing to indicate "that somehow between December and February the bank was contacting Dr. Yang." Further, the court did not "have any evidence that between December and February Dr. Yang was refusing to cooperate and making [a] quid pro quo demand." Rather, the evidence plainly revealed the attempts to contact Yang regarding refinancing the homes occurred at least a month *past* the court-imposed deadline. It is not feasible to expect Yang to participate in a process he knew nothing about.

Then, the court identified the fatal flaw in Huynh's argument: Yang's participation in Huynh's plan, as proposed, would require that he relinquish all interest in the two properties, yet only guarantee half the equalization payment even though the court required payment in full. Yang was understandably reluctant to remove his name from the deeds, which would impair his ability to recover the remaining judgment and the court's authority to order it. Because Huynh's refinancing proposals would not satisfy the equalization payment, the court properly did not order Yang to participate in a process that abrogated his rights and ability to enforce judgement in the future.

## B. *The Parcels as Fungible Property*

Huynh also argues that the court erred by considering the two houses *merely* as pieces of property. She endeavors to explain that the properties, consisting of her personal residence and a rental property from which she derives income, are unique, "non-fungible" and "cannot be replaced." She

consistently argues that their sale will cause "irreparable harm." Her argument fails, however, because the court was abundantly aware of the nature of the properties and oft reminded Huynh that "[i]n the family law context, the house is an asset. It has a cash value." This is the phrasing that Huynh objects to on appeal, asserting the court only treated the homes as mere assets. However, it is clear the court understood the nature of the home and endeavored to protect Yang's financial interest in the property in light of the home's nature. It explained that, if Yang's name was removed from the title as part of Huynh's refinancing without his receiving the full equalization payment, Huynh might "homestead" the property and thereby prejudice Yang's interest in recovering his share of the community property. And although the homesteading concern only applies to the former shared family home and not to the rental property, Huynh advances no argument that the rental property is somehow unique or sentimental. In fact, she primarily argues that "[p]ublic policy favors litigants keeping their homes when possible." It is not always possible. We evaluate the properties together, as community assets Huynh hoped to retain, and conclude the court did not err in treating the parcels of property as assets with value.

## C. *The Refinancing Timeline in the Judgment*

Finally, we look to Huynh's contention that she was not allowed to complete refinancing based on a schedule that was defined in the judgment. Both here and in the trial court, Huynh has argued that she tried to refinance the properties, that the effort was ongoing and that, in accordance with those two conditions of the judgment having been met, she should be allowed to keep the properties, regardless of her ability to make the equalization payment.

6

The court did not initially specify a deadline for Huynh to make the payment, though it later indicated it was to be paid "forthwith."  However, the court was "clear in the tentative" that it "was expecting [Huynh] to move right away" with respect to the refinancing.  Huynh asserted to the court that she began refinancing the properties in July 2021 when she first approached Bank of America.  The record before us does not bear this out; Huynh reached out to Bank of America on *August* 14, 2021 to inquire into the "*option* of a high-balance loan for [her] home, and the *possibility* of refinancing the rental property."  (Italics added.)  Further, in her briefing to this court, Huynh states the process "was started in November 2021."  We take this to refer to the refinancing process with Chase.

Huynh's argument ignores the fact that the entire purpose behind refinancing the properties, as repeatedly stated by the court, was to fund Huynh's equalization payment to Yang.  If refinancing allowed Huynh to make the equalization payment, both Yang and the court were content to permit her to retain the houses.  The purpose of the judgment was *not* to ensure that Huynh could keep the properties, but rather to equitably divide community property as required by the Family Code.  (See Family Code, § 2550.)  It is an untenable position that the court arbitrarily ordered Huynh to refinance the properties without reason and her arguments disregard the rationale for the permission that the court granted to her.

Despite repeated opportunities to do so, Huynh never offered a plan to fully satisfy the equalization payment.  Finally, after significant delay, the court had little choice but to order the properties sold.  There was no abuse of discretion in making such an order.

7

## DISPOSITION

The order is affirmed.  Yang is entitled to costs on appeal.

DATO, J.

WE CONCUR:

IRION, Acting P. J.

BUCHANAN, J.